IMG FRAGRANCE BRANDS, LLC, Dana Classic Fragrances, Inc. Zohar CDO 2003–1 Limited, Zohar II 2005–1 Limited, Zohar III Limited, and IMG Holdings, Inc., Plaintiffs,

v.

HOUBIGANT, INC., Etablissement Houbigant, and Michael J. Sherman, Defendants.

Houbigant, Inc. & Etablissement Houbigant, Counter–Plaintiffs,

v.

IMG Fragrance Brands, LLC, Dana Classic Fragrances, Inc. Zohar CDO 2003–1 Limited, Zohar II 2005–1 Limited, Zohar III Limited, IMG Holdings, Inc., Patriarch Partners, LLC, and Lynn Tilton, Counter–Defendants.

No. 09 Civ. 3655 (LAP).

United States District Court, S.D. New York.

Dec. 18, 2009.

George G. Mahfood, Broad and Cassel, Miami, FL, Charles Anthony Michael, Hillary Richard, Brune & Richard LLP, Maryann Jungmin Sung, Cleary Gottlieb Steen & Hamilton, LLP, New York, NY, Richard Lawrence Rosenbaum, for Plaintiffs and Counter–Defendants.

John W. Schryber, Patton Boggs LLP, Washington, DC, Todd R. Harrison, Patton Boggs LLP, Mary E. Flynn, Morrison Cohen, LLP, New York, NY, for Defendants and Counter Claimants.

### MEMORANDUM & ORDER

LORETTA A. PRESKA, Chief Judge.

Defendants and Counter–Plaintiffs Houbigant, Inc. and Etablissement Houbigant bring various counterclaims arising out of alleged breaches of a trademark licensing agreement and other collateral agreements. Plaintiffs and Counter–Defendants move to dismiss Counterclaims II–IX pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, Counter–Defendants' motion is GRANTED in part and DENIED in part.

## I. BACKGROUND [1]

### A. The Parties

Counter–Plaintiffs Houbigant, Inc. and Etablissement Houbigant (collectively, "Houbigant" or "Plaintiffs") are engaged in the business of licensing fragrance product trademarks. (Countercl. ¶ 63.) Counter–Defendant IMG Fragrance Brands, LLC ("IMG Brands"), a wholly-owned subsidiary of Counter–Defendant IMG Holdings, Inc. ("IMG Holdings"), licenses cer-

---

1. In their Counterclaims, Counter–Plaintiffs detail many of the provisions of the various agreements at issue here. This Background section will outline the parties, the relationship among the parties, and the main contractual provisions. The allegations concerning each specific count of the Counterclaims will be set forth in greater detail in Section II *infra*.

tain fragrance product trademarks owned by Houbigant pursuant to a License Agreement dated December 19, 2003 (the "License Agreement"). (*Id.* ¶¶ 64–65.) Counter–Defendant Dana Classic Fragrances, Inc. ("DCF") is a sub-licensee of IMG Brands that manufactured and promoted various fragrance products. (*Id.* ¶ 67.) Counter–Defendants Zohar CDO 2003–1 Limited ("Zohar I"), Zohar II 2005–1 Limited ("Zohar II"), and Zohar III Limited ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds") are private equity funds with each holding the following percentage of IMG Holdings' stock: Zohar I–13%; Zohar II–51%; and Zohar III–11%. (*Id.* ¶ 68–70.) Counter–Defendant Patriarch Partners, LLC ("Patriarch") is the collateral manager for the Zohar Funds, and Counter–Defendant Lynn Tilton ("Tilton") is the Chief Executive Officer of Patriarch. (*Id.* ¶¶ 71–72.)

## B. *The License Agreement*

On December 19, 2003, Houbigant entered into a License Agreement with IMG Brands whereby IMG Brands, as Licensee, was given the exclusive right to use various trademarks including Chantilly®, White Chantilly®, and Demi–Jour among others (the "Products"). (*Id.* ¶ 80–81.) Although the License Agreement was scheduled to expire on December 31, 2008, Houbigant maintains that it terminated the agreement by notifying IMG Brands on December 28, 2008. (*Id.* ¶ 82.)

The License Agreement set forth several conditions with which IMG Brands had to comply in order to receive Houbigant's continuing consent to use the trademarks. Some of these conditions included:

(a) IMG Brands had the ability to manufacture and promote the sales of the Products (Countercl., Ex. A § 3);

(b) Any sub-licensee would need to be preapproved by Houbigant and would have to abide by the terms of the License Agreement (*id.*);

(c) Facilities used to manufacture the Products must be disclosed to Houbigant, and Houbigant reserved the right to inspect those facilities (*id.* § 7(b), (e));

(d) IMG Brands would pay periodic royalties to Houbigant on the first day of each month throughout the duration of the License Agreement (*id.* § 9);

(e) Upon termination of the agreement, IMG Brands would be permitted to sell Products for an additional 135 days, known as the "Relevant Period" (*id.* § 18);

(f) Either party could enforce an amendment to the License Agreement so long as the amendment was in writing and signed by both parties (*id.* § 28); and

(g) On the thirtieth day after termination of the License Agreement, IMG Brands had the option to purchase the trademarks for $1,000, so long as IMG Brands made payment for any outstanding Royalty Payments on or before the twenty-ninth day following termination. (*Id.* § 9)

In January 2004, IMG Brands appointed DCF as a sublicensee. (Compl.¶ 88.) In October 2008, Houbigant alleges that IMG Brands and DCF engaged several subcontractors to manufacture the Products and that the manufacturing facilities the subcontractors used were not specified in the License Agreement. (*Id.* ¶ 90; Ex. A § 7(e).)

## C. *The Supplemental Royalty Agreement*

The Supplemental Royalty Agreement ("SRA") was executed on December 19,

2003 by Houbigant and IMG Holdings. (*Id.* ¶ 135.) Under the terms of the SRA, IMG Holdings was required to provide Houbigant with notice should there be any inquiry, offer, or plan by an entity to acquire 50% or more of the stock of IMG Holdings. (*Id.* ¶ 137.) If a non-affiliate of IMG Holdings acquired 50% or more of IMG Holdings' stock, the SRA provided that IMG Holdings would pay Houbigant a supplemental royalty. (*Id.* ¶¶ 141–43.) Houbigant alleges that on or about October 10, 2008, the Zohar funds, which had loaned money to DCF, issued an "Acceleration Notice," which if not rescinded would force DCF, and its guarantors-IMG Holdings and IMG Brands-to turn over their assets to DCF's lenders. (*Id.* H 145.) On October 17, 2008, the Zohar Funds agreed to rescind the Acceleration Notice in exchange for a 75% shareholder interest in IMG Holdings. (*Id.* ¶ 146.) Houbigant further alleges that in order to gain the approval of Isaac Cohen, IMG Holdings' majority shareholder, IMG Holdings caused the Zohar Funds to release Cohen's personal guarantees valued at over $20 million. (*Id.*)

### D. *Subsequent Agreements*
#### i. *The Fifth Deferral Agreement*

On August 27, 2008, Houbigant and IMG Brands entered into a Fifth Deferral Agreement ("FDA") which set forth a payment schedule for IMG Brands to pay the past due royalty payments owed pursuant to the License Agreement. (*Id.* ¶¶ 154–55.) The FDA contained several other conditions and also incorporated the previous four deferral agreements. (*Id.* ¶¶ 158–164.) Some of the amendments made by the prior deferral agreements included: (1) reducing the cure period from thirty days to five days (*id.* ¶ 164); (2) requiring IMG Brands to pay a Deferral Fee of $350,000 no later than the date of expiration of the License Agreement (*id.* ¶ 165);

and (3) requiring yet another deferral fee of $175, 000 (*id.* ¶ 166.).

Houbigant alleges that IMG Brands represented that it had obtained all of the necessary approvals from its lenders to enter into the FDA. (*Id.* ¶ 171.) Houbigant further claims that IMG Brands, the Zohar Funds, and Tilton knew of the FDA and performed pursuant to its terms until December 31, 2008. In fact, Houbigant received at least one scheduled payment from Wells Fargo, one of IMG Brands lenders. (*Id.* ¶ 177.) It was not until December 31, 2008 that IMG Brands, through Patriarch, informed Houbigant that the FDA was unenforceable because it modified the terms of the License Agreement without the consent of Wells Fargo. (*Id.* ¶ 190.) Therefore, IMG Brands did not make the remaining payments. (*Id.* ¶ 188.)

#### ii. *The Consulting and Product Development Agreement*

In order to assist DCF's sale of Houbigant products, the parties entered into a Consulting and Product Development Agreement ("CPDA"). (*Id.* ¶ 192.) Under the terms of the agreement, Houbigant was to provide consulting services in exchange for a fee that equaled the outstanding royalty payments. (*Id.*) Houbigant alleges that, although its services were never requested, DCF confirmed that its obligation to Houbigant under the CPDA was $1,139,736. (*Id.* ¶ 195.)

### E. *The Alleged Breaches*

Houbigant alleges that IMG Brands and DCF caused Products to be manufactured at unauthorized locations (*Id.* ¶¶ 92, 196.) Houbigant further alleges that IMG Brands and DCF, both under the direction of Patriarch and Tilton, breached the License Agreement in myriad ways, including: selling Products after December 31,

2008; failing to pay additional royalties; failing to make final payments under the FDA; failing to disclose or to provide notice to Houbigant of default notices received from lenders; failing to provide Houbigant with financial reports and statements; and failing to honor its account-stated debt under the CPDA. (*Id.* ¶ 196.)

## II. *ANALYSIS*

### A. *Motion to Dismiss Standard*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557, 127 S.Ct. 1955.

In *Iqbal*, the Supreme Court set forth a "two-pronged" approach for analyzing a motion to dismiss. *Iqbal*, 129 S.Ct. at 1950. First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in plaintiff's favor. *Id.* at 1949–50. The court may then proceed to identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Once the court has stripped away the conclusory allegations, it must determine whether the complaint's "well-pleaded factual allegations ... plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factu-

al content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Evaluating the plausibility of a plaintiff's claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citation omitted).

### B. *Counts II and IV–Breach of the License Agreement and the SRA*

In its second claim for relief, Houbigant alleges that Defendants IMG Brands, DCF, Patriarch, and Zohar II breached the License Agreement and, in its fourth claim for relief, Houbigant alleges that IMG Holdings breached the SRA. The Counterclaims adequately state a claim for breach of the License Agreement as against IMG Brands and DCF and a claim for breach of the SRA as against IMG Holdings. Because neither Patriarch nor Zohar II was a signatory to the License Agreement, neither can be held liable for breach of contract. Accordingly, Defendants' motion to dismiss Count II is granted in part and denied in part, and their motion to dismiss Count IV is denied.

 In order to plead a breach of contract claim, a plaintiff must allege: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach." *Ixe Banco, S.A. v. MBNA America Bank, N.A.*, No. 07 Civ. 0432, 2008 WL 650403, at *5 (S.D.N.Y. Mar. 7, 2008) (citing *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F.Supp.2d 155, 160 (S.D.N.Y.2007)).[2] De-

**2.** The License Agreement is governed by New York Law. (Countercl., Ex. A § 23.)

fendants argue that because Houbigant did not give Defendants notice of any defaults and opportunity to cure, Houbigant's breach of contract claim is precluded. (Def. Mot. at 5.) Section 17 of the License Agreement provides that a "party claiming a breach or default shall promptly notify the other party, in writing of the claimed default or breach in as specific detail as is reasonably possible ... and shall provide [the breaching party] with a right to cure the claimed default or breach, if curable, within thirty days of the date of notification...." (Countercl., Ex. A § 17(a).) As this Court discussed in *Ixe Banco,* however, a notice and cure provision like the one here provides a party with a means of curing a default which would otherwise allow the non-defaulting party to terminate the agreement; it does not constitute a condition precedent to a party's right to sue. *See Ixe Banco,* 2008 WL 650403, at *11. Under the License Agreement, " 'a declaration of default is a condition precedent not to suing for a breach of contract but to being authorized to terminate the contract immediately without liability to the other party.' " *Id.* (quoting *Allan Block Corp. v. County Materials Corp.,* 512 F.3d 912, 919 (7th Cir.2008)); *see Trustco Bank, N.A. v. Cannon Bldg. of Troy Assocs.,* 246 A.D.2d 797, 800, 668 N.Y.S.2d 251 (N.Y.App.Div., 3d Dep't, 1998) (finding that, pursuant to the terms of an agreement, a "declaration of default was not a condition precedent" to a suit on a guarantee); *see also Hypergraphics Press, Inc. v. Cengage Learning, Inc.,* No. 08 C 5102, 2009 WL 972823, *3 (N.D.Ill. Apr. 8, 2009) ("[I]n order for notice and opportunity to cure to be a condition precedent to filing suit on the claim, the contract *must* state so.") (emphasis added). Therefore, Houbigant was not required to plead around Defendants' affirmative defense in order to state a claim for breach of contract. Accordingly, Defendants IMG

Brands' and DCF's, motion to dismiss Count II is denied.

■ Houbigant's allegations that Patriarch and Zohar II are also liable for breach of the License Agreement are insufficient to state a cause of action. IMG Brands is a wholly-owned subsidiary of IMG Holdings. (Countercl. ¶ 66.) As alleged in the Counterclaims, Zohar II acquired 51% of the stock of IMG Holdings on or about October 17, 2008. (*Id.* ¶ 69.) Patriarch is the collateral manager of the Zohar Funds. (*Id.* ¶ 71.) Under New York law, a corporate parent is not automatically liable for the acts of its wholly owned subsidiary, even where the parent and subsidiary corporations have interlocking directorates. *See Beck v. CONRAIL,* 394 F.Supp.2d 632, 637 (S.D.N.Y.2005); *Manchester Equip. Co. v. Am. Way Moving Co.,* 60 F.Supp.2d 3, 7 (E.D.N.Y.1999); *Lorkowski v. J.C. Pitman Co., Inc.,* 177 A.D.2d 1021, 578 N.Y.S.2d 40 (N.Y.App. Div., 4th Dep't, 1991) (holding that parent corporation could not be held liable for any acts of wholly-owned subsidiary; although boards of directors of the two corporations overlapped, in all other respects corporation had not disregarded subsidiary's corporate separateness, had not involved itself directly in management of subsidiary and had not otherwise dominated or controlled subsidiary); *Townley v. Emerson Elec. Co.,* 178 Misc.2d 740, 681 N.Y.S.2d 741, 745 (N.Y.Sup.Ct.1998) ("Stock control, interlocking directors and interlocking officers are in and of themselves insufficient facts to justify the imposition of such liability on the parent corporation.") (citing *Musman v. Modern Deb,* 50 A.D.2d 761, 762, 377 N.Y.S.2d 17 (N.Y.App.Div., 1st Dep't, 1975)); *see also Am. Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.1988). However, a parent can be held liable for a subsidiary's breach of contract if the plaintiff can show that the "parent corporation

'exercised complete domination of [the subsidiary] corporation in respect to the transaction attacked; and ... that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury.'" *Banks v. Corr. Servs. Corp.*, 475 F.Supp.2d 189, 196 (E.D.N.Y.2007) (quoting *Morris v. N.Y. State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993)); *see Sheridan Broadcasting Corp. v. Small*, 19 A.D.3d 331, 332, 798 N.Y.S.2d 45 (N.Y.App.Div., 1st Dep't, 2005) ("Parent and subsidiary or affiliated corporations are, as a rule, treated separately and independently so that one will not be held liable for the contractual obligations of the other absent a demonstration that there was an exercise of complete dominion and control but evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance.") (internal citations and quotation marks omitted).

■ Here, the Counterclaims do not adequately allege Patriarch's or Zohar II's domination and control of IMG Brands. In considering whether a parent corporation exercised "complete domination" over its subsidiary, courts consider such factors as:

(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir.1997); *see Fantazia Int'l Corp. v. CPL Furs New York, Inc.*, 67 A.D.3d 511, 512–13, 889 N.Y.S.2d 28 (N.Y.App.Div., 1st Dep't, 2009) (listing factors and citing *Freeman* ). The Counterclaims do not contain such allegations. Moreover, Zohar II and Patriarch are the majority shareholder and manager, respectively, of IMG Brands' parent, IMG Holdings. Therefore, in order to place Patriarch or Zohar II on the hook for IMG Brands' alleged breach, Houbigant would have to allege that IMG Holdings dominated and controlled IMG Brands and that Zohar II and Patriarch dominated and controlled IMG Holdings-a two-tiered domination so to speak. The Counterclaims make no such allegations.

■ Furthermore, Houbigant's argument that Patriarch and Zohar II succeeded to IMG Brands' liabilities pursuant to the successor clause in the License Agreement is unavailing. The License Agreement provides that the "Agreement shall be binding on and enure to the benefit of the successors and assigns of both parties hereto and all persons or entities succeeding to or acquiring the business now carried on by [Houbigant] or [IMG Brands]." (Countercl., Ex. A § 31.) As discussed above, Zohar II acquired an interest in IMG Brands' parent, IMG Holdings, and Patriarch is the collateral manager for Zohar II. Therefore, neither Zohar II nor Patriarch can be deemed a successor to IMG Brands, as neither entity acquired an interest in IMG Brands. Moreover, the Counterclaims lack any allegation that either Zohar II or Patriarch expressly assumed the obligations of the License Agreement. *See Sillman v. Twentieth Century–Fox Film Corp.*, 3 N.Y.2d 395, 402, 165 N.Y.S.2d 498, 144 N.E.2d 387 (1957) ("[I]t is well settled in this State that the assignee of rights under a bilater-

al contract does not become bound to perform the duties under that contract unless he expressly assumes to do so . . . .") (citations omitted). Accordingly, Defendants Zohar II's and Patriarch's motion to dismiss Count II is granted.

■ Finally, the Counterclaims adequately allege a breach of the SRA by IMG Holdings. Houbigant alleges that, pursuant to the SRA, it was entitled to (1) notice of a potential change in control transaction whereby an entity would acquire 50% or more of the equity of IMG Holdings, and (2) a supplemental royalty payment equaling a percentage of the consideration received by IMG Holdings for the acquisition. (Countercl. ¶¶ 139, 143; Ex. B §§ 1, 2.) Houbigant alleges that it never received notice that the Zohar Funds sought to acquire a 75% stake in IMG Holdings and that it never received a percentage of the consideration IMG Holdings received for the acquisition. (Countercl. ¶¶ 144, 146.) The alleged consideration received by IMG Holdings consisted of the Zohar Funds' release of over $20 million in personal guarantees by its then-CEO, Isaac Cohen. (*Id.* ¶ 146.)

Although IMG Holdings contends that the release of Cohen's guarantee did not constitute a transfer of "economic value" to IMG Holdings, thereby negating its duty to make a supplemental royalty payment to Houbigant (*see* Def. Mem. at 18), this argument is inappropriate on a motion to dismiss. This Court must accept Houbigant's allegations as true, and here, Houbigant adequately alleges that IMG Holdings received valuable consideration in exchange for Zohar II's acquisition. (Countercl. ¶ 146.) Regardless, Houbigant adequately alleges that it was entitled to notice if IMG Holdings received inquiries

from potential purchasers and that it never received such notice. (*Id.* ¶¶ 138–40, 144.) Accordingly, IMG Holdings' motion to dismiss Count IV is denied.

## C. *Counts III and V—Tortious Interference*

### i. *Zohar Funds and Patriarch*

In its third claim of relief, Houbigant alleges that Zohar I and Zohar III induced IMG Brands to breach the License Agreement.[3] In its fifth claim of relief, Houbigant alleges that Patriarch, Tilton, and the Zohar Funds induced IMG Holdings to breach the SRA. Because the Zohar Funds and Patriarch have an economic interest in IMG Holdings and IMG Brands, the parties cannot be liable for tortious interference absent sufficient allegations of malice, fraud or illegality. Houbigant's conclusory allegations do not meet the pleading standard set forth in *Iqbal*, nor do they plead fraud with the necessary particularity; as such, the claim must be dismissed. Moreover, the Counterclaims do not adequately allege that Tilton acted so far outside her scope as Chief Executive Officer of Patriarch as to make her liable for tortious interference. Therefore, Defendants' motion to dismiss Counts III and V are granted.

■ Under New York law, a claim for tortious interference requires "the existence of a valid contract between plaintiff and a third party, defendant's knowledge of the contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc. et. al.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370

---

**3.** Houbigant also alleges, in the alternative, that if Patriarch and Zohar II are not liable for breach of the License Agreement, that they be held, along with Tilton, liable for tortious interference.

(1996).[4] Where the defendants have an economic interest in the contract, however, alleging the above elements is insufficient. *See White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 835 N.Y.S.2d 530, 867 N.E.2d 381 (2007) (holding that economic interest defense is available, *inter alia*, "where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff.") (footnotes omitted). The plaintiff must also adequately allege that the defendant either acted maliciously, fraudulently, or illegally. *See Foster v. Churchill*, 87 N.Y.2d 744, 750, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996); *Hirsch v. Food Resources, Inc.*, 24 A.D.3d 293, 297, 808 N.Y.S.2d 618 (N.Y.App.Div., 1st Dep't, 2005).[5]

■ Here, Houbigant acknowledges that the Zohar Funds and Patriarch have an economic interest in IMG Holdings-the parent of IMG Brands. (Countercl. ¶¶ 68–71 (alleging that Zohar Funds had a 75% interest in IMG Holdings and that Patriarch was the collateral manager of the Zohar Funds).); *see Hirsch*, 24 A.D.3d at 297, 808 N.Y.S.2d 618 (owner of 83 1/3% interest acted "with an economic interest"). Therefore, in order adequately to allege tortious interference by a party with an economic interest, Houbigant must allege that the Zohar Funds and Patriarch

acted either maliciously, fraudulently, or illegally. Houbigant has failed to do so.

In characterizing Defendants' conduct as "malicious," Houbigant alleges that the Zohar Funds and Patriarch acted "without justification." (Countercl. ¶¶ 201, 227, 236.) Such allegations, without more, are inadequate. *See Rather v. CBS Corp.*, 68 A.D.3d 49, 886 N.Y.S.2d 121, 128 (N.Y.App.Div., 1st Dep't, 2009) (finding "bare allegations of malice" to be insufficient "to bring the [tortious interference] claim under an exception to the economic interest rule"); *see also Ruha v. Guior*, 277 A.D.2d 116, 717 N.Y.S.2d 35, 36 (N.Y.App. Div., 1st Dep't, 2000) (holding that "plaintiffs' bare allegations of malice do not suffice, particularly where such allegations are contradicted by plaintiffs' own claims that defendants' actions were financially [motivated]").

■ Additionally, Houbigant's claims that "IMG Brands (and the other Counter–Defendants)" committed fraud by withholding from Houbigant that IMG Brands had obtained the consent of all the lenders "relative to each deferral agreement" are wholly insufficient under *Iqbal*, let alone under the heightened pleading standard required under Rule 9(b). Moreover, as will be discussed in Section II.C, *infra*, because Houbigant's and IMG Brands' relationship was a contractual *one* as opposed to a fiduciary one, IMG Brands did not have a duty to disclose to Houbigant, and therefore, its alleged omissions were not fraudulent.

■ Finally, Houbigant's allegations that Defendants induced IMG Brands' and

---

**4.** The parties have assumed that New York State law governs Plaintiff's asserted claims, and the Court concludes that New York choice of law rules would point to the application of New York State law.

**5.** *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir.2008) ("'[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.'"); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir.1998) (same).

IMG Holdings' breach by illegal means-specifically, by violating the Lanham Act (*see* Countercl. ¶¶ 196–99, 201, 227, 238)-are wholly without merit. As an initial matter, the SRA was a separate agreement between IMG Holdings and Houbigant. (Countercl., Ex. B.) The SRA does not state that a breach of the SRA operates to rescind the Licensing Agreement. Accordingly, even if the Zohar Funds and Patriarch counseled IMG Holdings to breach the SRA, that activity would be a mere breach of contract, not illegal conduct.

█ As for the License Agreement, any alleged inducements by the Zohar Funds or Patriarch are also only breach of contract claims, not illegal activity. *Affiliated Hospital Prods., Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1186 (2d Cir.1975) (holding that where license agreement existed the "agreement controls the rights of the respective parties in the use of the [trademark]" and in order to bring a claim for trademark infringement, the licensor must show conduct by the licensee "sufficiently grave to warrant rescission of that agreement"-absent such a showing, licensor is only entitled to a claim for breach of contract). None of Defendants' alleged breaches rises to the level of materiality that would permit Houbigant to rescind the License Agreement, nor has Houbigant requested such relief. Among other breaches, though, Houbigant alleges that, pursuant to the direction of the Zohar Funds and Patriarch, IMG Brands and DCF continued to sell Products beyond the December 31, 2008 termination date of the License Agreement. (Countercl. ¶ 196.) Although such conduct would normally constitute trademark infringement, the License Agreement provided that, following termination of the agreement, IMG Brands could continue to sell Products for an additional 135 days.[6] *See Baskin–Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.,* 576 F.Supp. 1055, 1060 (E.D.N.Y. 1983) ("[T]he continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes ... trademark infringement as well as a breach of contract."); *see also Romacorp, Inc. v. TR Acquisition Corp.,* No. 93 Civ. 5394, 1993 WL 497969 (S.D.N.Y. Dec. 1, 1993) (holding that continued use of trademark after termination of franchise for nonpayment of royalties constitutes Lanham Act violation). Lastly, to the extent Houbigant alleges post-termination breaches (*i.e.,* alleged breaches that occurred after the close of the 135–day period), these claims do not concern tortious interference with contract, but instead, because the contact by its terms *no* longer existed, the claims are ones for trademark infringement. Accordingly, Defendants Patriarch's and the Zohar Funds' motion to dismiss Counts III and V is granted.

### ii. *Tilton*

█ Houbigant's tortious interference claim against Tilton, in her individual capacity, also fails. As discussed above, the general rule is that a claim for tortious interference will lie only against a stranger who improperly interferes with a contract between two contracting parties. *See, e.g., Finley v. Giacobbe,* 79 F.3d 1285, 1295 (2d Cir.1996) (tortious interference claim was properly dismissed because plaintiff could not establish that defendants were third parties to the contract). However, "a narrow exception exists for officers acting wholly outside the scope of

---

**6.** For a more thorough discussion of this provision, the Court refers the parties to the Memorandum and Order [dkt. no. 54] in *Hou-* *bigant, Inc. et al. v. IMG Fragrance Brands, LLC et al.,* No. 09 Civ. 839(LAP), 2009 WL 5102791 (S.D.N.Y. Dec. 18, 2009).

their authority for purely personal gain, but an enhanced pleading standard applies." *Scuderi v. Springer*, No. 03 Civ. 2098, 2004 WL 2711048, at *2 (S.D.N.Y. Nov. 29, 2004) (citing *Finley*); *see also Joan Hansen & Co., Inc. v. Everlast World's Boxing Headquarters Corp.*, 296 A.D.2d 103, 109–110, 744 N.Y.S.2d 384 (N.Y.App.Div., 1st Dep't, 2002) ("A cause of action seeking to hold corporate officials personally responsible for the corporation's breach of contract is governed by an enhanced pleading standard.... Failure to plead in nonconclusory language facts establishing all the elements of a wrongful and intentional interference in the contractual relationship requires dismissal of the action." (citations omitted)). "A pleading must allege that the acts complained of, whether or not beyond the scope of the [officer's] corporate authority, were performed with malice and were calculated to impair the plaintiff's business for the personal profit of the [officer]." *Everlast*, 296 A.D.2d at 110, 744 N.Y.S.2d 384.

 Here, aside from general allegations that Defendants operated under the direction of Tilton, Houbigant makes no claim that Tilton acted to interfere with the License Agreement or the SRA for her own personal gain. Merely asserting that Tilton caused IMG Brands, DCF, Patriarch, and IMG Holdings to breach their respective agreements fails to meet the enhanced pleading requirement under New York law to hold corporate officers personally liable. Accordingly, Tilton's motion to dismiss Counts III and V is granted.

### D. *Count VI—Fraud*

Houbigant's sixth cause of action for fraud alleges two different types of fraudulent behavior. First, Houbigant alleges that IMG Brands and DCF failed to disclose to Houbigant multiple events of default, which Houbigant claims, if it had been aware of such breaches, it would have terminated the License Agreement. (Countercl. § 242.) Houbigant further alleges that IMG Brands misrepresented to Houbigant that it had obtained all of the necessary lender consents it needed to enter into the deferral agreements. (*Id.* § 245.) For the reasons set forth below, the claim is dismissed.

 To state a cause of action for fraud in New York, a plaintiff must allege: (1) a material false representation; (2) intent to defraud; (3) reasonable reliance upon the misrepresentation; and (4) resulting damages. *See Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996); *see also Orlando v. Kukielka*, 40 A.D.3d 829, 831, 836 N.Y.S.2d 252 (N.Y.App.Div., 2d Dep't, 2007) (same). Additionally, in order for a plaintiff to state a claim for fraudulent concealment, there must exist a "confidential or fiduciary relationship" between the parties. *Mobil Oil Corp. v. Joshi*, 202 A.D.2d 318, 318, 609 N.Y.S.2d 214 (N.Y.App.Div., 1st Dep't, 1994). New York law also requires that a fraud claim, raised in a case that stems from breach of contract, be "sufficiently distinct from the breach of contract claim." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citing *Papa's–June Music, Inc. v. McLean*, 921 F.Supp. 1154, 1162 (S.D.N.Y. 1996)); *see Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *7 (S.D.N.Y. July 17, 2007) (dismissing fraud claim where the it appeared "to rest entirely on the subjects covered in the representations and warranties contained in the agreements"); *Gibraltar Mgmt. Co., Inc. v. Grand Entrance Gates, Ltd.*, 46 A.D.3d 747, 749, 848 N.Y.S.2d 684 (N.Y.App.Div., 2d Dep't, 2007) (affirming grant of summary judg-

ment where plaintiff could not show that the "cause of action was [ ] sufficiently distinct from the breach of contract cause of action to constitute a separate cause of action."); *see also Kestenbaum v. Suroff*, 268 A.D.2d 560, 561, 704 N.Y.S.2d 260 (N.Y.App.Div., 2d Dep't, 2000) (same); *Rubinberg v. Correia Designs*, 262 A.D.2d 474, 475, 692 N.Y.S.2d 172 (N.Y.App.Div., 2d Dep't, 1999) (same). In *Bridgestone/Firestone*, the Court of Appeals for the Second Circuit set forth three ways by which a party could distinguish its fraud claim from its breach of contract claim. A plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20 (citations omitted). As discussed below, Houbigant fails to meet any of these exceptions.

■ First, Houbigant's argument that the parties' relationship was not merely contractual in nature but in fact rose to the level of a fiduciary relationship is not supported either by the allegations in the Counterclaims or by controlling law. Houbigant contends that the terms of the License Agreement and the FDA establish a fiduciary relationship. (Opp. at 14.) However, nothing in the FDA implies that IMG Brands owes fiduciary duties to Houbigant (*see* Countercl., Ex. C), and the License Agreement, other than setting forth the parties' rights and obligations to each other, does not state that IMG Brands (or its sublicensee, DCF) owes Houbigant any heightened duty of trust or confidence (*see id.*, Ex. A). In New York, "parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree." *Calvin*

*Klein Trademark Trust v. Wachner*, 123 F.Supp.2d 731, 733–34 (S.D.N.Y.2000); *see EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19–20, 799 N.Y.S.2d 170, 832 N.E.2d 26 (2005) ("Generally, where parties have entered into a contract, courts look to that agreement 'to discover ... the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency.'" (quoting *Ne. Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 160, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993))). This is true even in the context of trademark licensing agreements. *See id.* at 734; *see also Weight Watchers of Quebec Ltd. v. Weight Watchers Intern., Inc.*, 398 F.Supp. 1047, 1053 (E.D.N.Y.1975) (finding that trademark "license, without more, does not create a fiduciary relationship."); 3 R. Callmann, UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES, § 20:54 (4th ed. 2009) (same). Accordingly, because neither IMG Brands nor DCF owed any special duty to Houbigant, Houbigant cannot satisfy the first *Bridgestone/Firestone* exception. *See Ritchie Capital Mgmt., L.L.C.*, 2007 WL 2044656, at *7 ("To the extent that there was a misrepresentation or omission in connection with those contractual representations and commitments, then that conduct must be pleaded as a breach of contract claim.").

■ Second, although Houbigant's claim that IMG Brands misrepresented to Houbigant that it had obtained the consent of the lenders to enter into the FDA would satisfy the second *Bridgestone/Firestone* exception, Houbigant did not plead the fraud with particularity. Therefore, Houbigant is granted leave to replead the alleged fraudulent misrepresentations made by Mr. Cohen in accordance with Fed. R.Civ.P. 9(b).

To satisfy the second *Bridgestone/Firestone* factor, the plaintiff must allege that

the misrepresentation is "collateral or extraneous to the contract." *Bridgestone/Firestone*, 98 F.3d at 20. To determine whether the fact is collateral to the contract, courts look to "whether the contract itself speaks to the issue." *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F.Supp.2d 419, 427 (S.D.N.Y. 2004). Here, the alleged representations concern whether IMG Brands received the approval of its various lenders-specifically, the approval of Wells Fargo-to enter into the FDA. (Countercl. § 245.) Nothing in the FDA speaks to whether IMG Brands either needed or received approvals from its lenders. Therefore, the allegation could survive a challenge under *Bridgestone/Firestone*. *See Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 617 (S.D.N.Y.2003) (declining to dismiss fraud claim at "this early stage" where plaintiff "has *alleged* promises that *may* have been collateral") (emphasis in the original). Nevertheless, Houbigant did not plead fraud with the particularity required under Rule 9(b).

In order to plead fraud, Houbigant must comply with the Federal Rules, in particular Rule 9(b), which states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be averred generally." Fed.R.Civ.P. 9(b). The Court of Appeals "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). If the allegations do not comply with these rules, "the court may, on motion or *sua sponte*, dismiss the complaint." *Shelly v. Brandveen*, No. 06 Civ. 1289, 2006 WL 898071, at *4 (E.D.N.Y. Apr. 3, 2006) (citing *Kittay v. Kornstein*, 230 F.3d 531, 542 (2d Cir. 2000)); *see Bonnie & Co. Fashions v. Bankers Trust Co.*, 945 F.Supp. 693, 719 (S.D.N.Y.1996) (dismissing *sua sponte* fraud claim on Rule 9(b) grounds). Here, the only substantive allegation concerning IMG Brands' misrepresentation is as follows:

> Before Houbigant executed the Fifth Deferral Agreement, IMG Brands, then-CEO, Isaac Cohen, represented to Houbigant that IMG Brands had obtained Wells' consent to the terms of the Fifth Deferral Agreement as they had been negotiated by the parties through the conclusion of such negotiations.

(Countercl. ¶ 169.) This sole allegation falls woefully short of the particularity required by the Federal Rules. Houbigant has identified both the content of the misrepresentation and who made the misrepresentation but has failed to identify when the misrepresentation was made, where it was made, and how it was made. Consequently, because this allegation may allow Houbigant to survive a *Bridgestone/Firestone* challenge, Houbigant is granted leave to replead this allegation with the particularity required by Rule 9(b).

As to the third and final exception of *Bridgestone/Firestone*, Houbigant has not pleaded "special damages [ ] caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone*, 98 F.3d at 20. The damages Houbigant seeks are indistinguishable from the damages it seeks from IMG Brands alleged breach of the License Agreement.

Accordingly, because neither IMG Brands nor DCF owed Houbigant any special or fiduciary duty, the fraudulent concealment claim is dismissed. Moreover,

the fraudulent misrepresentation claim as against IMG Brands is also dismissed because Houbigant has not pleaded the fraud with particularity. Houbigant is granted leave to replead the fraudulent misrepresentation with the particularity required by Rule 9(b).

### E. *Count VII—Accounting*

 Under New York law, to state a claim for accounting, a plaintiff must establish four conditions: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *Pressman v. Estate of Steinvorth,* 860 F.Supp. 171, 179 (S.D.N.Y.1994) (quoting *300 Broadway Realty Corp. v. Kommit,* 37 Misc.2d 325, 235 N.Y.S.2d 205, 206 (N.Y.Sup.Ct.1962)). For the reasons set forth above, the relationship between Houbigant and IMG Holdings was merely contractual, not fiduciary in nature. Moreover, Houbigant has the tools of discovery to determine the value of IMG Holdings' assets. *See Addax BV Geneva Branch v. Eastern of New Jersey, Inc.,* No. 05 Civ. 9139, 2007 WL 1321027, at *2 (S.D.N.Y. May 4, 2007) ("Although [plaintiff] seeks an accounting to establish its damages, it can make use of 'familiar discovery devices [to] obtain any information … it need[s] to establish its allegations as to damages.'" (quoting *Arnold Prods., Inc. v. Favorite Films Corp.,* 298 F.2d 540, 542–43 (2d Cir.1962))). Accordingly, IMG Holdings' motion to dismiss Count VII is granted.

### F. *Count VIII–Account Stated*

 The Counterclaims adequately plead a claim for an account stated. To state a claim for an account stated, the plaintiff must plead that: "(1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated." *The Haskell Co. v. Radiant Energy Corp.,* No. 05–CV–4403, 2007 WL 2746903, at *12 (E.D.N.Y. Sept. 19, 2007); *see Eastman Kodak Co. v. W.H. Henken Industries, Inc.,* No. 05–CV–6425, 2007 WL 1726472, at *3 (W.D.N.Y. June 14, 2007) ("To recover under a theory of an 'account stated,' a plaintiff must demonstrate 'an agreement between the parties to an account based upon prior transactions between them'") (citing *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 64 (2d Cir.1999)) (citation and internal quotation marks omitted); *see also Abbott, Duncan & Wiener v. Ragusa,* 214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (N.Y.App.Div., 1st Dep't, 1995) ("An account stated is an account, balanced and rendered, with an assent to the balance either express or implied. There can be no account stated where no account was presented or where any dispute about the account is shown to have existed.") (internal citations omitted); *Reisman, Peirez & Reisman, L.L.P. v. Gazzara,* No. 2823/02, 15 Misc.3d 1113(A), 2007 WL 949436, at *2 (N.Y.Sup.Ct.2007) ("The common law elements of a cause of action for an account stated are: the existence of a debtor-creditor relationship, a mutual examination of the claims of the respective parties, the striking of a balance, and an agreement, express or implied, that the party against whom the balance is struck will pay the debt."). The second and third requirements (acceptance of the account as correct and a promise to pay the amount stated) may be implied if "a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." *Worsham,* 185 F.3d at 64. Under a claim for an account stated, "[e]ven though there may be no express promise to pay, yet from the very fact of stating an account, a

promise arises by operation of law as obligatory as if expressed in writing." *Leepson v. Allan Riley Co., Inc.,* No. 04 Civ. 3720, 2006 WL 2135806, at *4 (S.D.N.Y. July 31, 2006) (quoting *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 719 (S.D.N.Y.1986)).

 Here, Houbigant's Counterclaims contain allegations that Houbigant and DCF entered into a series of agreements that, together, constituted the CPDA. (Countercl. ¶ 192.) Moreover, in December 2008, Houbigant alleges it received correspondence from DCF confirming that DCF owed Houbigant $1,139,736.00 under the CPDA. (*Id.* ¶ 195.) DCF's argument that "Houbigant had failed to plead that than [sic] the deferral agreements were authorized by the lenders, and thus, those agreements are also void," are factual arguments that this Court cannot consider on a motion to dismiss. Accordingly, Defendant DCF's motion to dismiss Count VIII is denied.

### G. *Count IX—Permanent Injunction*

 Finally, Houbigant's ninth cause of action for a permanent injunction must be dismissed because Houbigant has not alleged that it has no adequate remedy at law. Houbigant requests that Defendant IMG Holdings be permanently enjoined both from destroying various records and from making payments to its shareholders. (Countercl. ¶ 256.) Generally, to obtain a permanent injunction "a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989). As to Houbigant's request concerning the records, Houbigant is already protected by the rules of general discovery. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001). Should it be discovered that IMG Holdings destroyed any relevant information after being put on notice, "the determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of [this Court]." *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). Lastly, Houbigant's request concerning the dissipation of assets is covered by its request for damages in conjunction with its breach of contract claim. Accordingly, Defendant IMG Holdings' motion to dismiss Count IX is granted.

### CONCLUSION

For the foregoing reasons, Counter–Defendants' motion to dismiss Counts II through IX of Counter–Plaintiff's Counterclaims [dkt. no. 12] is GRANTED in part and DENIED in part as follows: Counts III, V, VII, and IX are dismissed in their entirety. Count II is dismissed as to Defendants Zohar II and Patriarch but not as to Defendants IMG Brands and DCF. Count VI is dismissed, but Houbigant is granted leave to replead its claim of fraudulent misrepresentation as against IMG Brands in accordance with Fed.R.Civ.P. 9(b). Counts IV and VIII remain in their entirety.

The parties shall confer and inform the Court by letter no later than January 8, 2010 how they propose to proceed.

SO ORDERED: