**EATONI ERGONOMICS, INC., Plaintiff,**

v.

**RESEARCH IN MOTION CORP.,**
Research in Motion Ltd.,
Defendants.

No. 08 Civ. 10079(WHP).

United States District Court,
S.D. New York.

June 24, 2009.

Eric W. Berry, Esq., Berry Law PLLC, New York, NY, for Plaintiff.

Craig D. Leavell, Esq., Kirkland & Ellis LLP, Chicago, IL, for Defendants.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Plaintiff Eatoni Ergonomics, Inc. ("Eatoni") brings this action against Defendants Research In Motion Corporation and Research In Motion Ltd. (collectively, "RIM") alleging antitrust violations, patent infringement, breach of contract, fraud, and breach of fiduciary duty. RIM moves to stay this action pending arbitration. Eatoni moves for a stay of arbitration to permit a new arbitrator to be selected by the parties. For the following reasons, RIM's motion to stay this action is granted and Eatoni's motion to stay arbitration is denied.

## BACKGROUND

This lawsuit is the latest in a series of disputes between the parties that began in 2004 when Eatoni asserted that RIM was infringing U.S. Patent No. 6,885,317 (the "'317 patent"), which relates to "Reduced QWERTY" keyboards, i.e., keyboards with multiple letters assigned to one key. (Complaint dated Nov. 18, 2008 ("Compl.") ¶¶ 14–33.)

### I. The Texas Action

In April 2005, RIM filed a declaratory judgment action in the Northern District of Texas (the "Texas Action"). (Compl. ¶ 63.) Following a court-ordered mediation, the parties executed a Settlement Agreement on September 26, 2005 (the "Settlement Agreement"). (Compl. ¶ 64.) The Settlement Agreement provided that the parties "settled all matters in controversy" in the Texas Action, and that the Settlement Agreement was "intended to be a full and final settlement agreement containing all terms even though the parties may prepare a more formal settlement document, release language and dismissal papers." (Declaration of Peter Bellacosa dated Jan. 23, 2009 ("Bellacosa Decl.") Ex. 1: Settlement Agreement.) The material terms of the Settlement Agreement were enumerated on a "Term Sheet."

The Term Sheet required RIM to invest in Eatoni and Eatoni to grant licenses to RIM for all of Eatoni's patents. (Settlement Agreement Ex. A: Term Sheet dated Sept. 26, 2005 ("Term Sheet") at 1.) It further provided for a "full and complete release of all claims asserted or that could have been asserted in the Texas Action and that the parties will dismiss the Texas Action with prejudice within five business days of the complete execution of a final agreement." (Term Sheet at 1.) Most importantly, the Term Sheet provided that "any disputes under this agreement will be (after mediation) subject to arbitration." (Term Sheet at 2.)

In February 2006, Eatoni refused to dismiss the Texas Action, and filed a demand for arbitration. (Bellacosa Decl. Ex. 6: Decision on Certain Preliminary Issues & Procedure Order No. 2 ("Preliminary Order") at 4.) In its demand, Eatoni sought (1) a declaration that the Settlement Agreement and the Term Sheet did not constitute a legally enforceable agreement; and (2) if the Settlement Agreement was enforceable, RIM's material breaches excused Eatoni's performance. (Preliminary Order at 4.) Later, Eatoni asserted an additional claim that it had been fraudulently induced to sign the Term Sheet. (Preliminary Order at 5–6.) After Eatoni filed this demand, RIM moved to dismiss the Texas Action and Eatoni moved to stay the case pending the arbitration. (Stay Order at 1.) While the parties disputed the validity of the Settlement Agreement, they both agreed its arbitration provision was valid and enforceable. (Stay Order at 3.) Eatoni and RIM disagreed over whether the validity, breach, and fraudulent inducement claims should be decided by arbitration. (Stay Order at 3.)

District Judge Kinkeade concluded that while the arbitration clause was narrow, "the language 'under this agreement' [was] certainly broad enough to include disputes as to the validity or enforceability of the agreement itself." (Stay Order at 7.) However, he declined to hold that the Eatoni's claims of patent infringement were arbitrable. (Stay Order at 11.)

The Arbitrator held hearings in New York City between February 26 and 28, 2007. (Bellacosa Decl. Ex. 5: Award dated Mar. 28, 2007 ("Award").) The Arbitrator determined that the Settlement Agreement was not impermissibly vague and was valid and enforceable. (Award at 7–17.) The Arbitrator directed the parties to work together in good faith in their joint venture discussions. (Award at 23–24.)

He also required dismissal of the Texas Action as soon as the parties resolved their joint venture issues, and retained jurisdiction to address any future disputes between the parties:

> In view of the arbitration agreement set forth in the last bullet point of the Term Sheet, the Arbitrator will retain jurisdiction to resolve any disputes that may arise over the performance of the parties' respective rights and obligations as set forth in Paragraph 1 of this Award, including, without limitation, any disputes that may arise over the working of any of the implementing agreements. If any dispute arises, either party may notify the Arbitrator of such dispute and it will be promptly resolved.

(Award at 25.)

## II. *The Present Action*

Eatoni's prolix complaint recounts the history of the parties' prior disputes and alleges seventeen different claims. The heart of Eatoni's allegations is that RIM breached the Settlement Agreement and Award by refusing to work with Eatoni to develop a new keyboard and software, and that it never intended to abide by the Settlement Agreement. Eatoni divides its claims into three categories: antitrust, contract, and patent infringement.

Claims 1 through 6 and 17 are antitrust claims. In Claims 1 through 5, Eatoni asserts that RIM is attempting to monopolize the "Reduced QWERTY" keyboard market and related technology through a pattern of anti-competitive conduct that included, *inter alia,* infringing Eatoni's patents, filing the Texas Action, fraudulently inducing Eatoni into the Settlement Agreement, and breaching the Settlement Agreement. (Compl. ¶¶ 148–49.) Claim 6 is a tying claim (Compl. ¶¶ 225–40), and Claim 17 seeks injunctive relief (Compl. ¶¶ 318–20).

Claims 7 through 12 are contract claims. They concern breaches of the Settlement Agreement and Arbitration Award, breach of fiduciary duty as a joint venturer, and fraudulent inducement. (Compl. ¶¶ 225–89.)

Claims 13 through 16 are patent infringement claims alleging infringement of the '317 patent. (Compl. ¶¶ 290–317.)

## DISCUSSION

### I. *Legal Standards*

#### A. *Stay*

 "When a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq.*, governs." *In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385, 400 (S.D.N.Y.2003). "[T]he Federal Arbitration Act ... expresses 'a liberal federal policy favoring arbitration agreements,' and that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 223 (2d Cir.2001) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). "Section 3 of the FAA provides that courts must stay any suit or proceeding until arbitration has been completed if the action concerns 'any issue referable to arbitration' under a written agreement for such arbitration." *Alemac Ins. Serv., Inc. v. Risk Transfer, Inc.*, No. 03 Civ. 1162(WHP), 2003 WL 22024070, at *3 (S.D.N.Y. Aug. 28, 2003) (quoting 9 U.S.C. § 3).

 In order to determine whether all or part of an action should be sent to arbitration, this Court must: (1) "determine whether the parties agreed to arbitrate;" (2) "determine the scope of that agreement;" (3) "consider whether Congress intended [any federal statutory claims] to be nonarbitrable;" and (4) "decide whether to stay the balance of the proceeding pending arbitration" if some but not all the claims in the case are arbitrable. *JLM Indus., Inc. v. Stolt–Nielsen S.A.*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Oldroyd v. Elmira Sav. Bank. FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).

#### B. *Choice of Law*

 Both federal and state law apply to arbitration clauses. *See Alliance Bernstein Inv. Research & Mgmt. v. Schaffran*, 445 F.3d 121, 125 (2d Cir.2006). The FAA "creates a 'body of federal substantive law of arbitrability' applicable to arbitration agreements." *Alliance Bernstein*, 445 F.3d at 125 (quoting *Mercury Constr.*, 460 U.S. at 24, 103 S.Ct. 927). However, "[b]ecause an agreement to arbitrate is a creature of contract ... the ultimate question of whether the parties agreed to arbitrate is determined by state law." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002). Thus, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). However, "[t]he issue of an arbitration agreement's scope is governed by the federal substantive law of arbitrability...." *Progressive Cas. Ins. Co. v. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 48 (2d Cir. 1993) (citations and quotation marks omitted).

 In determining what state law applies the Settlement Agreement, this Court considers New York choice of law

rules. *See Beth Israel Med. Center v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 582 (2d Cir.2006). New York courts apply the "center of gravity" or "grouping of contacts" analysis in contract cases. *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 939 (1993). The factors considered in this analysis include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Allstate,* 597 N.Y.S.2d 904, 613 N.E.2d at 939. Considering these factors, this Court finds that Texas is the center of gravity of the Settlement Agreement because the contract was negotiated and partially performed there. Moreover, the underlying suit was filed in Texas, and RIM is domiciled there. Accordingly, Texas law applies.

## II. *Agreement to Arbitrate*

 Pursuant to the FAA, "if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, [a court] must choose it ...." *Bank Julius Baer & Co. v. Waxfield Ltd.,* 424 F.3d 278, 284 (2d Cir.2005). Under Texas law, "[w]hen an agreement incorporates another agreement which provides for arbitration, the subsequent agreement should spell out in unequivocal terms those provisions or terms expressly excluded." *Transwestern Pipeline Co. v. Horizon Oil & Gas Co.,* 809 S.W.2d 589, 591 (Tex.Ct. App.1991). If there is no conflict or inconsistency regarding arbitration, "[t]he arbitration clauses of the underlying contracts remain valid and must be enforced when resolving any dispute which arises from the contracts, as modified." *Transwestern,* 809 S.W.2d at 592. An unconfirmed

arbitration award is a contractual obligation. *See* Tex. Civ. Prac. & Rem.Code Ann. § 154.027(b); *see also Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 176 (2d Cir.1984).

 Eatoni argues that the Award is a final judgment that extinguishes the arbitration clause. But the Award incorporates the Settlement Agreement, and specifically references the arbitration clause. Thus, under the plain language of the Award, the arbitration clause remains in effect and applies to disputes arising under the Award as well as the Settlement Agreement and Term Sheet.[1] *See Transwestern,* 809 S.W.2d at 592.

## III. *Scope of the Arbitration Clause*

 "No fixed rules govern the determination of an arbitration clause's scope." *Louis Dreyfus,* 252 F.3d at 225. Instead, "the scope of an arbitration clause, like any contract provision is a question of intent of the parties." *Louis Dreyfus,* 252 F.3d at 225. "[A] court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." *Louis Dreyfus,* 252 F.3d at 225. "When the parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to arbitrated ... while the intended scope of a narrow arbitration clause is obviously more limited." *Louis Dreyfus,* 252 F.3d at 225. Arbitration clauses limited to disputes "under" or "arising under" the agreement without

---

1. Even if there was any merit in Eatoni's argument that res judicata bars further arbitration, that is a question for the arbitrator, not this Court. *See W. Dow Hamm III Corp. v. Millennium Income Fund L.L.C.,* 237 S.W.3d 745, 753–57 (Tex.Ct.App.2007).

more expansive language are normally found to be narrow. *See Bristol–Myers Squibb Co. v. SR Int'l Bus. Ins. Co.*, 354 F.Supp.2d 499, 503–05 (S.D.N.Y.2005). Thus, this Court concludes that the arbitration clause in the Settlement Agreement is narrow.

Under a narrow arbitration clause, a dispute will only be subject to arbitration if "the dispute is an issue that 'is on its face within the purview of the clause.'" *Louis Dreyfus*, 252 F.3d at 225 (quoting *Rochdale Via. Inc. v. Pub. Serv. Employees Union*, 605 F.2d 1290, 1295 (2d Cir.1979)). "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." *Louis Dreyfus*, 252 F.3d at 225. "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, [courts] focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987). Generally, a dispute will be found to arise under an agreement where the dispute goes to the "interpretation of the contract and matters of performance." *Bristol–Myers Squibb*, 354 F.Supp.2d at 506 (quoting *In re Kinoshita & Co.*, 287 F.2d 951, 953 (2d Cir.1961)).

Eatoni's claims for breach of contract must be arbitrated. So too, Eatoni's fraud claim appears to be an effort to re-litigate its fraudulent inducement claim—a claim that Eatoni conceded in the Texas Action clearly falls within the scope of this arbitration clause. Finally, the breach of fiduciary duty claims are merely an attempt to re-cast breach of contract claims as tort claims. Courts have repeatedly "refuse[d] to allow a party's solemn promise [to arbitrate] to be defeated by artful pleading." *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir.1993). Thus, irrespective of the label—breach of contract,

fraudulent inducement, or breach of fiduciary duty—claims 7 through 12 all involve performance under the Settlement Agreement and Award and are arbitrable.

While the antitrust claims will be affected by the Arbitrator's decision on claims 7 through 12, they are not disputes under the Settlement Agreement or Award. And, the patent infringement claims also go beyond performance under the Settlement Agreement. Thus, the antitrust and patent infringement claims are not arbitrable.

## IV. Stay of the Remaining Claims

A court may stay issues not subject to arbitration "pursuant to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir.1997) (internal quotation omitted). "Broad stay orders are ... appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856.

Following arbitration, Eatoni's remaining claims either will be completely resolved or greatly simplified. If the Settlement Agreement is determined to be valid, RIM has a license to all of Eatoni's patents and the patent infringement claims will likely fail. Similarly, a key allegation of the monopolization claims is that RIM breached the Settlement Agreement as part of a pattern of anticompetitive conduct. A determination of whether RIM actually violated the Settlement Agreements and Award will simplify those claims as well. Finally, the antitrust tying claim substantially overlaps with the monopolization claims and judicial efficiency will be served by a stay of that claim.

Accordingly, the antitrust and patent infringement claims are stayed pending the outcome of arbitration.

### V. *Eatoni's Motion for a Stay to Appoint a New Arbitrator*

 "An arbitrator may retain jurisdiction regarding issues that arise out of the rendering of an award, and the maintenance of jurisdiction does not require the award to be vacated." *Pathmark Stores, Inc. v. Local 1199,* No. 92 Civ. 5230 (DLC), 1999 WL 20896, at *4 (S.D.N.Y. Jan. 19, 1999) (citing *Pine Valley Prods. v. S.L. Collections,* 828 F.Supp. 245, 249 (S.D.N.Y. 1993)). Here, the Settlement Agreement envision an iterative process between the parties concerning their Joint Venture. Given the structure of the Settlement Agreement and the Arbitrator's familiarity with the complex web of disputes between the parties, it was reasonable for the arbitrator to retain jurisdiction.

Thus, there was nothing improper about the Arbitrator's retention of jurisdiction. His continued availability is an efficient dispute resolution mechanism and serves the interests of the parties. Accordingly, Eatoni's motion for a stay so that a new arbitrator can be chosen is denied.

### CONCLUSION

For the foregoing reasons, Defendants' motion to stay this case pending arbitration is granted and Plaintiffs motion to stay the arbitration is denied. The Clerk of the Court is directed terminate all pending motions as moot and to mark this case as closed subject to a letter request from either party to re-open the case after arbitration. The parties shall notify this Court within three business days of any final decision in the arbitration. The parties shall submit a joint letter to the Court ten business days following any final decision in the arbitration to update the Court on the status of the litigation and the parties' intentions.

SO ORDERED: