**HARD ROCK CAFE INTERNATIONAL, (USA), INC., Plaintiff,**

v.

**HARD ROCK HOTEL HOLDINGS, LLC, et al., Defendants.**

**No. 10 Civ. 7244(WHP).**

United States District Court,
S.D. New York.

July 11, 2011.

---

Bruce Roy Millar Ewing, Brooke Ellen Pietrzak, Christopher George Karagheuzoff, Gianfranco Gustavo Mitrione, Dorsey & Whitney LLP, New York, NY, for Plaintiff.

Bruce P. Keller, Jeremy Feigelson, Julie Marie Calderon Rizzo, Matthew Bennette Harris, Debevoise & Plimpton, LLP, New York, NY, James J. Regan, James Frederick Rittinger, Satterlee Stephens Burke & Burke LLP, New York, NY, for Defendants.

### MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

This litigation involves a business dispute over the iconic "Hard Rock" trademarks. The pending motions to dismiss address the sufficiency of the claims and

counterclaims and seek to arbitrate certain other claims. While the corporate history of these entities is complex, this Court makes the following distillation: Plaintiff Hard Rock Café International (USA), Inc. ("HRCI") owns the "Hard Rock" trademarks. In 1996, HRCI licensed some of those trademarks to Hard Rock Hotel Inc. ("HR, Inc."), Hard Rock Hotel Holdings, LLC ("HR Holdings"), and HRHH IP, LLC ("HR IP") (collectively, the "Hard Rock Defendants"). The Hard Rock Defendants' corporate structures include a number of affiliated entities also named as defendants: Morgans Hotel Group Co. ("Morgans Hotel"), Morgans Hotel Group Management, LLC ("Morgans Management"), Morgans Group LLC ("Morgans Group") (collectively, the "Morgan Defendants"), as well as DLJMB HRH VoteCo LLC, DLJ MB IV HRH, LLC, and DLJ Merchant Banking Partners IV, L.P. (collectively, the "DLJ Defendants"). The Morgan Defendants and the DLJ Defendants characterize themselves collectively as the "Equity Holder Defendants." This Court adopts that nomenclature.[1]

HRCI asserts a breach of contract claim against the Hard Rock Defendants. It also asserts various trademark dilution, infringement, and unfair competition claims under the Lanham Act and New York law against all Defendants. The Hard Rock Defendants counterclaim for breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with business relations.

The Equity Holder Defendants move to dismiss all of the claims against them pursuant to Fed. R. of Civ. P. 12(b)(6) and 8(a)(2). The Hard Rock Defendants move to dismiss certain claims under Fed. R. of Civ. P. 12(b)(6), to compel arbitration of

other claims, and to stay this action. Not to be outflanked on motions addressed to the pleading, HRCI moves to dismiss the Hard Rock Defendants' counterclaims.

For the following reasons, the Hard Rock Defendants' motion to dismiss HRCI's breach of contract claim is denied. The Hard Rock Defendants' motion to compel arbitration is granted, but their motion to stay this action is denied. With the exception of the claims against Morgans Management, HRCI's claims against the other Equity Holder Defendants are dismissed. HRCI's motion to dismiss the Hard Rock Defendants' breach of contract counterclaim is granted with respect to seeking to develop properties in the Morton Territories, but is denied in all other respects. HRCI's motion to dismiss the counterclaim for breach of the covenant of good faith and fair dealing is denied. Finally, HRCI's motion to dismiss the counterclaim of tortious interference with business relations is granted.

## BACKGROUND

### I. The License Agreement and the Parties

The sparring in this action revolves around a 1996 licensing agreement between HRCI and the Hard Rock Defendants. (First Amended Complaint dated Nov. 23, 2010 ("Compl.") ¶¶ 31–33; Ex. 3: Trademark License and Cooperation Agreement by and between Rank Licensing, Inc. and Peter A. Morton dated Jun. 7, 1996 (the "Agreement").)

Under the Agreement, HRCI granted the Hard Rock Defendants an exclusive license to use and exploit the HARD ROCK HOTEL and HARD ROCK CASI-

---

**1.** HRCI names three other Defendants—Turner Broadcasting System, Inc., Brad Lachman Productions, Inc., and Genco Enter- tainment, Inc.—none of whom join in these motions.

NO trademarks (the "Hard Rock Marks") in areas west of the Mississippi River (the "Morton Territories"), "solely in connection with development, operation, ownership, management, operation of and promotion of Hard Rock Hotel/Casinos and Hard Rock Casinos." (Compl. ¶¶ 31, 34; Agreement ¶¶ 2–3; *see also* Answer to First Amended Complaint and Counterclaims of Defendants Hard Rock Hotel Holdings, LLC, Hard Rock Hotel, Inc. and HRHH IP, LLC dated Dec. 7, 2010 ("Countercl.") ¶ 6.) The Agreement also permitted the Hard Rock Defendants to "develop, maintain and update a Web page" for its properties in the Morton Territories. (Agreement ¶ 8(b).) The Hard Rock Defendants were permitted under the Agreement to sublicense the specific rights granted to them. (Agreement ¶ 10.) Importantly, HRCI reserved for itself "[a]ll rights not specifically granted" to the Hard Rock Defendants for itself. (Agreement ¶ 3(a).)

The Agreement imposed reciprocal obligations on the parties to "use their best efforts to protect [the Hard Rock Marks] and the goodwill associated therewith" (the "Best Efforts Clause"). (Agreement ¶ 6(a).) Those reciprocal obligations extended to "promotional and/or advertising materials, including national or international broadcasts, in locations where both parties maintain, directly or indirectly … Hard Rock Facilities …, when practical and appropriate, [the parties are] to include reference to the other party's Hard Rock Facilities in that location." (Agreement ¶ 8(a)(1).) Similarly, HRCI and the Hard Rock Defendants agreed "to include links to the other party's Web pages" on their websites. (Agreement ¶ 8(b).)

The Agreement provides a limited dispute resolution mechanism: "In the event of any dispute regarding the failure of [the Hard Rock Defendants] to conform to any provision of quality control as set forth herein or to correct any such related deficiencies, the dispute shall be resolved by binding arbitration" (the "Arbitration Clause"). (Agreement ¶ 5(a).) However, "claims, controversies or disputes relating to the validity of [the] License Agreement or the validity or enforceability of any trademark rights hereunder, shall be excluded from arbitration." (Agreement ¶ 5(d).) The Agreement is governed by New York law, and any disputes are required to be prosecuted in New York courts. (Agreement ¶ 14.)

Also relevant to consideration of these motions are the relationships among the Defendants. Morgans Hotel, Morgans Group and the DLJ Defendants own HR Holdings. (Compl. ¶¶ 5–8, 10–13.) HR Holdings is controlled by a five-person board of directors (the "Board") with Morgans Hotel, Morgans Group and the DLJ Defendants each appointing one director. (Compl. ¶ 49.) HR Holdings owns HR IP and HR Inc. (Compl. ¶ 48.) The DLJ Defendants also receive fees for consulting and other services it provides to the Hard Rock Hotel and Casino in Las Vegas (the "Hotel"). (Compl. ¶¶ 48, 51.)

The HR Holdings Board approves all operating plans and licensing and sublicensing agreements. (Compl. ¶ 49.) Morgans Hotel and Morgans Group employees are also officers of HR Holdings. (Compl. ¶ 52.) Thus, HRCI alleges that Morgans Hotel and Morgans Group have "directly participated in operating and managing various aspects of" HR Holdings' business. (Compl. ¶ 52.)

Morgans Management is the exclusive operator of the Hotel. (Compl. ¶ 50.) According to the Complaint, Morgans Management supervised the trademark infringement and dilution that is the focus of this action. (Compl. ¶ 50.)

## II. *The Claims*

### A. *"Rehab" Television Program*

In 2008 and 2009, Turner Broadcasting System aired the television series "Rehab: Party at the Hard Rock Hotel" ("Rehab"). (Compl. ¶ 44.) HRCI claims that all of the Defendants are joint tortfeasors that "authorized, created and distributed" Rehab and permitted the use of Hard Rock Marks in the television series. (Compl. ¶¶ 54–55.) Rehab was a "reality" television program that portrayed the Hotel "as a destination that revels in drunken debauchery, acts of vandalism, sexual harassment, violence, criminality and a host of other behavior that most members of the general … public … would find unseemly and objectionable." (Compl. ¶¶ 47, 55.) HRCI claims that Rehab's depiction of raucous pool parties damaged the goodwill of the Hard Rock Marks and breached the Agreement. (Compl. ¶¶ 55–57, 62.)

### B. *Tulsa and Albuquerque Properties*

Defendants sub-licensed the Hard Rock Marks to Cherokee Nation Enterprises, which operates a Hard Rock Hotel and Casino in Tulsa, Oklahoma, and to the Pueblo of Isleta Indian tribe for a Hard Rock Hotel and Casino in Albuquerque, New Mexico (the "Tulsa and Albuquerque Properties"). (Compl. ¶¶ 81, 95.) HRCI alleges that "the range of services, character of the establishment and the experience offered to customers [at the Tulsa and Albuquerque Properties] is incompatible with consumer expectations for goods and services branded with the Hard Rock Marks." (Compl. ¶¶ 82, 96) (alterations omitted). HRCI also claims that use of the Hard Rock Marks at those properties constitutes a breach of the Agreement. (Compl. ¶¶ 83, 85, 105–06).

## III. *The Counterclaims*

The Hard Rock Defendants assert that HRCI has waged a "campaign" to deprive the Hard Rock Defendants of their rights under the Agreement. (Countercl. ¶ 15.) Specifically, the Hard Rock Defendants maintain that HRCI sought to open competing hotel and casino operations or similar ventures branded with other Hard Rock trademarks in the Morton Territories. (Countercl. ¶¶ 15–16, 18.) This campaign included efforts to open "Hard Rock Live!" music venues at existing hotel/casinos within the Morton Territories. (Countercl. ¶ 17.) According to the Hard Rock Defendants, HRCI sought to use these music venues to impermissibly brand existing "hotel-casinos as Hard Rock Hotel–Casinos." (Countercl. ¶¶ 17–18.) The Hard Rock Defendants also allege that HRCI told their business partners that the Hard Rock Defendants did not have the authority to sub-license the Hard Rock Marks. (Countercl. ¶ 19.) The Hard Rock Defendants assert that HRCI's campaign breached the Agreement and violated its obligation of good faith and fair dealing. (Countercl. ¶ 20.)

HRCI also registered the domain name "hardrockcasinoalbuquerque.com." The Hard Rock Defendants maintain that this domain name registration breached the Agreement, which granted them an exclusive right to "develop, maintain and update a Web page for the Hard Rock Hotel/Casinos or Casinos in the Morton territories." (Countercl. ¶ 21.)

The Hard Rock Defendants allege that HRCI's decision to omit the Tulsa and Albuquerque Properties from its website "pull-down lists" breaches paragraph 8(a) of the Agreement. (Countercl. ¶¶ 22–23.) Similarly, HRCI failed to mention the Tulsa and Albuquerque Properties in national and international print advertisements. (Countercl. ¶ 23.) Finally, the Hard Rock

Defendants claim that HRCI personnel made statements to industry trade publications, and to their potential business partners, that the Hard Rock Defendants lack authority over the Hard Rock Marks. (*See* Countercl. ¶¶ 24–25.) These statements allegedly damaged the Hard Rock Defendants' reputation and interfered with their business relations. (Countercl. ¶¶ 26–27.)

## DISCUSSION

### I. *Legal Standard on a Motion to Dismiss*

On a motion to dismiss, the allegations in a complaint are accepted as true. *City of Pontiac Gen. Empls.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011). Nevertheless, the complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir.2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[It] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

To determine plausibility, courts follow a "two pronged approach." *Iqbal*, 129 S.Ct. at 1950. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (internal quotation marks and alteration omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"

*Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir.2010) (quoting *Iqbal*, 129 S.Ct. at 1950). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949 (citation omitted).

Finally, on a motion to dismiss, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference." *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000).

### II. *The Equity Holder Defendants' Motion to Dismiss*

#### A. *Joint Tortfeasor Liability*

A corporate parent is not automatically liable for the acts of its wholly owned subsidiary. *IMG Fragrance Brands, LLC v. Houbigant Inc.*, 679 F.Supp.2d 395, 403 (S.D.N.Y.2009). Nevertheless, because unfair competition, trademark infringement, and trademark dilution are tortious acts, every entity "actively partaking in, lending aid to, or ratifying and adopting such acts is liable" as a joint tortfeasor. *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F.Supp.2d 368, 385 (S.D.N.Y.2010) (quoting *David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir.1989)); *McCarthy on Trademarks and Unfair Competition*, § 25:23 at 25–67 (same). To state a joint tortfeasor claim, a plaintiff must allege that "the defendant and the direct infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties[,] or exercise joint ownership or control over the infringing product." *Fendi*, 696 F.Supp.2d at 386 (quotation and citation omitted).

Mere knowledge of a tortious act by a subsidiary is insufficient to state a claim against a corporate parent. *Piccoli*

*A/S v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2d 157, 173 (S.D.N.Y.1998). Rather, a joint tortfeasor must participate in the alleged misconduct. *See, e.g., Fendi*, 696 F.Supp.2d at 386; *Microsoft Corp. v. AGA Solutions, Inc.*, 589 F.Supp.2d 195, 197 (E.D.N.Y.2008) (finding that defendants that "personally participated in and/or had the right and ability to supervise, direct and control the infringing conduct" are liable as joint tortfeasors); *EZ–Tixz, Inc. v. Hit–Tix, Inc.*, No. 93 Civ. 3791(CSH), 1995 WL 77589, at *6 (S.D.N.Y. Feb. 27, 1995) (joint tortfeasor liability requires defendant to "specifically direct[ ], approve[ ] or otherwise engage[ ]" in infringing acts).

HRCI avers that the Equity Holder Defendants "directly authorized, controlled and participated" in activities that constitute trademark infringement, trademark dilution and unfair competition. (*See* Compl. ¶¶ 54, 66, 78–79, 92–93, 107–08, 113–15, 118.) However, "mere conclusory statements" are insufficient to sustain a claim. *Mills*, 572 F.3d at 72. Because the alleged participation of the Equity Holder Defendants varies, each needs to be analyzed separately.

■ As to the DLJ Defendants, HRCI claims they participated in the tortious conduct by appointing HR Holdings board members and earning fees for consulting and other services. However, neither the appointment of a board member nor the receipt of fees for consulting services demonstrate that the DLJ Defendants "directed, approved or otherwise engaged" in the infringing acts. *EZ–Tixz, Inc.*, 1995 WL 77589, at *6. HRCI's Complaint is bereft of any allegations showing that the DLJ Defendants were in an actual or apparent partnership with the Hard Rock Defendants or had the ability to obligate each other or to control the allegedly infringing activities. Accordingly, HRCI's claims against the DLJ Defendants are dismissed.

■ Turning to the Morgans Defendants, Morgans Hotel and Morgans Group permitted some of their employees to also serve as officers of HR Holdings. While these allegations differ from the allegations against the DLJ Defendants, they still do not permit the inference that Morgans Hotel or Morgans Group participated in any wrongdoing. *See Microsoft*, 589 F.Supp.2d at 197. Moreover, in the analogous context of corporate veil piercing, "a corporate parent is not automatically liable for the acts of its wholly owned subsidiary, even where the parent and subsidiary corporations have interlocking directorates." *IMG Fragrance Brands*, 679 F.Supp.2d at 403. Joint tortfeasor liability cannot be used to "circumvent" the more stringent "corporate veil piercing requirements." *Sahu v. Union Carbide Corp.*, 418 F.Supp.2d 407, 412 (S.D.N.Y.2005). HRCI's interlocking officer allegations cannot sustain its claims against Morgans Group and Morgans Hotel. Accordingly, HRCI's claims against Morgans Hotel and Morgans Group are dismissed.

■ In contrast to the other Equity Holder Defendants, Morgans Management operated the Hotel. In that capacity, the Complaint appropriately alleges it supervised and controlled the Hotel's operations including the infringing activity. *See Fendi*, 696 F.Supp.2d at 386–87. Accordingly, Morgans Management's motion to dismiss is denied.

### B. *Fed.R.Civ.P. 8(a)(2)*

Morgans Management also asserts that the Complaint violates Fed.R.Civ.P. 8(a)(2) because it lumps all the Defendants together without identifying separate individual acts by Morgans Management. However, "[r]ule 8 does not require [the]

Plaintiff[ ] to identify each of the [ ] Defendants by name each time the Complaint makes an allegation that applies equally to all." *In re Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 471 (S.D.N.Y.2005). The complaint must merely "give the defendant[s] fair notice of what plaintiff's claim is and the grounds upon which it rests." *Appalachian Enters., Inc. v. ePayment Solutions Ltd.*, No. 01 Civ 11502(GBD), 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 7, 2004) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). The Complaint is sufficient because it pleads specific facts about the relationship between Morgans Management and the other Defendants, and states claims against Morgans Management.

## III. *The Best Efforts Clause*

 Under New York law, enforcement of a "best efforts" clause is proper only when there are a "clear guidelines against which to measure such efforts." *Strauss Paper Co., Inc. v. RSA Exec. Search, Inc.*, 260 A.D.2d 570, 688 N.Y.S.2d 641, 642–43 (1999); *Pinnacle Books, Inc. v. Harlequin Enterps. Ltd.*, 519 F.Supp. 118, 121 (S.D.N.Y.1981). Those guidelines need not be explicit in the agreement. *See McDarren v. Marvel Entm't Grp., Inc.*, No. 94 Civ. 0910(LMM), 1995 WL 214482, at *5 (S.D.N.Y. April 11, 1995) (citing *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 508 (2d Cir.1989)).

 The Hard Rock Defendants contend that there are no objective criteria to measure "best efforts" because "the genre of reality shows like 'Rehab' did not even exist" when the Agreement was executed. (Def.'s Reply Mem. at 6.) But that issue cannot be resolved on the pleadings. *See US Airways Grp., Inc. v. British Airways PLC*, 989 F.Supp. 482, 491 (S.D.N.Y.1997).

## IV. *Defendants' Motion to Compel Arbitration*

 Under the Federal Arbitration Act ("FAA"), a court should order arbitration if it is satisfied that a dispute is "referable to arbitration under [written] agreement" of the parties. 9 U.S.C. §§ 3–4. While parties cannot be compelled to arbitrate absent an agreement, *AT & T Techs., Inc. v. Commc'ns Workers of Amer.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), there is "a strong federal policy favoring arbitration." *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir.2002) (citation omitted). Where an arbitration clause is narrow, the controversy must fall within its "purview." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 221 (2d Cir.2001). "[A]rbitration clauses must be read as broadly as possible, and 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Eaton Vance Mgmt. v. Forstmann-Leff Assocs., LLC*, No. 06 Civ. 1510(WHP), 2006 WL 2331009, at *4 (S.D.N.Y. Aug. 11, 2006) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

The Hard Rock Defendants seek to compel arbitration only on the claims relating to Rehab and the Tulsa and Albuquerque Properties. The Arbitration Clause provides that "any dispute regarding the failure of [the Hard Rock Defendants] to conform to any provision of *quality control* . . . shall be resolved by binding arbitration." (Agreement ¶ 5(a) (emphasis added).) However, "disputes relating to the validity of [the] License Agreement or the validity or enforceability of any trademark rights hereunder, shall be excluded from arbitration." (Agreement ¶ 5(d).)

HRCI argues that claims relating to Rehab and the Tulsa and Albuquerque Properties are exempt from arbitration because they concern trademark infringement and contractual breaches warranting termination of the Agreement. In deciding whether a dispute falls within an arbitration clause, courts must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 633 F.Supp.2d 109, 116 (S.D.N.Y.2009) (quoting *Genesco. Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987)); *see also JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 173 (2d Cir.2004) (internal citation omitted). To determine whether the arbitration clause reaches the Rehab and Tulsa and Albuquerque Properties claims, this Court examines the claims' factual underpinnings.

### A. *Rehab*

HRCI argues that the dispute concerning Rehab involves its "content" and not its quality. Quality, according to HRCI, is "the show's production values[,] cinematography," (Pl. Opp'n at 22), or "acting in the program" (Hr'g Tr. dated Feb. 15, 2011 ("Tr.") at 22). However, a show's content, like its production values, requires a series of judgments about which "particular character[istics]" of the Hotel to portray. *Black's Law Dictionary* (9th ed. 2009) (defining "quality"). For example, some audiences may prefer Rehab to focus on the pool party, while others would rather see the program focus on interpersonal relationships. Such determinations require an assessment of the quality of each potential storyline. Accordingly, HRCI's objections to the "content" of Rehab are really objections about the "quality" of Rehab.

HRCI also asserts that Rehab is an unauthorized "entertainment product" and beyond the scope of the Arbitration Clause. (Pl. Opp'n at 22.) However, the Agreement permits the Hard Rock Defendants to use the Hard Rock Marks "in *connection with* the ... promotion of Hard Rock Hotel/Casinos and Hard Rock Casinos." (Agreement ¶ 2(a) (emphasis added); *see also* ¶ 4(a).) This "promotion, advertising or marketing ... and broadcasting" may be done "anywhere in the world." (Agreement ¶ 2(a).) Moreover, the Arbitration Clause refers all claims concerning the "nature and quality" of "Licensed Services" to arbitration. (Agreement ¶ 4(a).) "Licensed Services" is defined broadly to include *"any and all* services provided by [the Hard Rock Defendants] in connection with or relating to the operation of [the Hotel]." (Agreement ¶ 1(1) (emphasis added).) Because Rehab portrays a party at the Hotel, it relates to the Hotel's services. Rehab is also clearly promotional in that it advertises the Hotel to Rehab's television audience. Accordingly, the Hard Rock Defendants' motion to compel arbitration of the claims relating to the quality of Rehab is granted.

### B. *Tulsa and Albuquerque Properties*

HRCI characterizes the dispute over the Tulsa and Albuquerque Properties as one involving "the range of services, character of establishment and the experience offered to customers [which] is incompatible with consumer expectation for goods and services branded with the Hard Rock Marks." (Compl. ¶¶ 82, 96) (alterations omitted). HRCI labels this trademark infringement, and not a "quality control" problem—asserting customers will be "unhappy when they visit the Tulsa and Albuquerque properties," not because of poor quality but because they are "very different." (Pl. Opp'n at 25.) This argument is pure semantics. *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir.1993) ("Courts have repeatedly 'refuse[d] to allow a party's solemn promise [to arbitrate]

to be defeated by artful pleading.' "). Disputes about "quality" concern the "particular character or properties of a[ ] thing, or act" not just the "degree of excellence" between two things. *Black's Law Dictionary* (9th ed. 2009) (defining quality). For example, HRCI may believe hotels need dance clubs to maintain high quality, while the Hard Rock Defendants may take the opposite view. Such a disagreement is not a dispute over trademark rights—it is a difference of opinion over the character of services that should be offered by a hotel. The present controversy regarding the "range of services, character of establishment and [ ] experience" offered by the Tulsa and Albuquerque Properties presents similar subjective questions of taste that the Agreement requires be arbitrated.

HRCI also argues that arbitration is not proper because the use of the Hard Rock Marks at the Tulsa and Albuquerque Properties is not authorized by the Agreement. (Pl. Opp'n at 21.) However, the Agreement indicates that the Hard Rock Defendants "have the right to sublicense or franchise any or all of the rights and licenses granted [in the Agreement]." (Agreement ¶ 10.) This includes the right to use the Hard Rock Marks "in connection with or relating to the operation of the Hard Rock Hotel/Casinos or Hard Rock Casinos." (Agreement ¶ 1(1); *see also* Agreement ¶¶ 2(a), 4(a).) Thus, the use of the unaltered[2] Hard Rock Marks at the Tulsa and Albuquerque properties is authorized by the Agreement and accordingly, the claims relating to the quality of the Tulsa and Albuquerque properties are referred to arbitration.

### C. *Motion to Stay the Remaining Claims Pending Arbitration*

■■■ If a court determines "that some, but not all, of the claims in [a] case

are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir.2008) (internal citations omitted). A court has "substantial discretion" in determining "whether to stay the remainder of the proceedings pending arbitration as a means to promote judicial efficiency and to control [its] docket[ ]." *Argus Media Ltd. v. Tradition Fin. Servs. Inc.*, No. 09 Civ. 7966(HB), 2009 WL 5125113, at *3 (S.D.N.Y. Dec. 29, 2009) (citing *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir.1997)). The party seeking a stay "bears a heavy burden of showing necessity" by demonstrating that a stay will not "hamper the progress of the arbitration proceeding," that the arbitration is "expected to conclude within a reasonable time," and that there will be no "undue hardship" imposed on the opposing party. *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir.1991) (quotation and citation omitted).

■■■ The Hard Rock Defendants have not satisfied their heavy burden. Moreover, the Arbitration Clause contains "specific carve-outs . . ., evincing a clear intent that [the remaining] claims be resolved in federal court independent of an arbitration proceeding." *Wu v. Pearson Educ., Inc.*, No. 09 Civ. 6557(RJH), 2010 WL 3791676, at *5 (S.D.N.Y. Sept. 29, 2010). Accordingly, the Hard Rock Defendants' motion to stay the remaining claims pending the outcome of arbitration is denied.

### V. *Plaintiff's Motion to Dismiss the Counterclaims*

### A. *Breach of the License Agreement*

■■■ A contract is unambiguous if the applicable provisions have "a definite

---

**2.** There are other claims that are not considered in this motion which allege the Hard

Rock Marks were improperly altered. (*See e.g.*, Compl. ¶¶ 84, 86.)

and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 396 (2d Cir.2009) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978)). "Ambiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000) (quoting *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)). Unambiguous contract provisions may be construed on a motion to dismiss. *Rounds v. Beacon Assoc. Mgmt. Corp.,* 09 Civ. 6910(LBS), 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009).

### 1. Seeking to Develop Properties in the Morton Territories

The Hard Rock Defendants' exclusive license is narrow: they may use the Hard Rock Marks "only" in the Morton Territories and "solely" in connection with the operations of Hard Rock Hotel Casinos and Hard Rock Casinos. (Agreement ¶ 2(a).) That license is narrowed further by several restrictions on the use of the Hard Rock Marks (*see, e.g.,* Agreement ¶¶ 2(b)(i)-(ix)) and a clause reserving "[a]ll rights not specifically granted to [the Hard Rock Defendants]" to HRCI (Agreement ¶ 3(a)). None of these provisions are ambiguous.

Moreover, use of the term "exclusive license" does not create ambiguity. In the Agreement, "exclusive license" means that HRCI may not license the Hard Rock Marks to others, or compete with the Hard Rock Defendants' right to use the Hard Rock Marks in the Morton Territories. *See Greenfield v. Philles Records,* 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 171 (2002) ("[A] court is not free to alter the contract to reflect its personal notions of fairness and equity.").

The Hard Rock Defendants argue that the term "exclusive license" means HRCI cannot compete with the Hard Rock Defendants "with respect to the particular products or particular territories for which the exclusive license was granted." (Defs' Opp'n at 5.). But no provision in the Agreement prohibits HRCI from opening other Hard Rock branded ventures such as restaurants and music venues in the Morton Territories. The Agreement only forbids HRCI from developing Hotel/Casinos in the Morton territories and Hotels in Nevada. (*See* Agreement ¶ 3(a).) The Hard Rock Defendants' interpretation attempts to rewrite the Agreement. *See Roswell Capital Partners LLC v. Alternative Const. Tech.,* No. 08 Civ. 10647(DLC), 2009 WL 497578, at *4 (S.D.N.Y. Feb. 27, 2009) ("Courts should refrain from rewriting the parties' contract or imposing additional terms.") (citing *Metro. Life Ins. Co. v. RJR Nabisco Inc.,* 906 F.2d 884, 889 (2d Cir.1990)).

Further, this Court will not look beyond the term "exclusive license" to examine the intent or purpose of the parties. That inquiry is only permissible if the language of the applicable provisions is vague. *See K. Bell & Assocs. Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996); *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). Accordingly, HRCI's motion to dismiss this breach of contract counterclaim is granted.

### 2. *Registering "hardrockcasinoalbuquerque.com"*

 HRCI also argues that the breach of contract counterclaim for registering the domain name hardrockcasinoalbuquerque.com should be dismissed. The Agreement provides that HRCI "may develop, maintain and update a World Wide Web page for the Hard Rock Café Restaurants, and other Hard Rock Facilities ... *except that* [the Hard Rock Defendants] may develop, maintain and update a Web page for the Hard Rock Hotel/Casinos or Casinos in the Morton Territories." (Agreement ¶ 8(b) (emphasis added).) The use of the word "except" limits HRCI's ability to develop, maintain and update websites for Hotel/Casinos and Casinos in the Morton Territories. Additionally, the language "develop[ing], maintain[ing], and updat[ing] a Web page" is reasonably capable of encompassing the Hard Rock Defendants' right to register this domain name. The Agreement is therefore ambiguous as to whether it granted the Hard Rock Defendants an exclusive right to register hardrockcasinoalbuquerque.com.

HRCI also argues that because the Agreement uses the singular "Web page" and not the plural "web pages," the Hard Rock Defendants may only create one web page for all of the properties in the Morton territories. (Pl. Mot. at 12.) But this is a strained interpretation. Because the Agreement authorizes the Hard Rock Defendants to sub-license the Hard Rock Marks within the Morton Territories (Agreement ¶ 10), it would be incongruous to permit only one web page for many different properties. It is therefore reasonable to conclude that "Web page" refers to one page per property. But on this point, the Agreement is ambiguous. Accordingly, HRCI's motion to dismiss this breach of contract counterclaim is denied.

### 3. *Failure to Include Tulsa and Albuquerque Properties in Pull Down Lists*

 The Agreement required each party to "include *links* to the other party's Web pages." (Agreement 8(b) (emphasis added).) HRCI maintains that it did not breach the Agreement by omitting the Tulsa and Albuquerque Properties from "pull down lists." (Pl. Mot. at 13.) However, by omitting the Tulsa and Albuquerque Properties from its pull down lists, HRCI failed to link to those properties on its web site.

HRCI also asserts that it does not have to link to properties that are sub-licensed by the Hard Rock Defendants. However, the term "other party's Web pages" is not defined. It could be interpreted to refer to properties that the Hard Rock Defendants sublicensed. The title of section eight, "Joint Cooperation," lends support to such an interpretation. Because paragraph 8(b) is ambiguous, HRCI's motion to dismiss this counterclaim for breach of contract is also denied.

### 4. *Failure to Mention the Tulsa and Albuquerque Properties in Advertisements*

 The Hard Rock Defendants also counterclaim that HRCI failed to mention the Tulsa and Albuquerque Properties in certain national and international advertisements. Under the sub-heading of "Promotional Cooperation" the Agreement states "[i]n promotional and/or advertising materials, ... in locations where both parties maintain, directly or indirectly by license, sublicense or franchise, Hard Rock Facilities, [the parties] each agree, when practical and appropriate, to include reference to the other party's Hard Rock Facilities in that location." (Agreement ¶ 8(a)(1).) HRCI argues that the word "locations" refers only to places where both parties have Hard Rock facilities,

and that because there is no allegation that HRCI "maintain[s]" a Hard Rock facility in either Tulsa or Albuquerque, it was not obligated to mention them in its advertisements. (Pl. Mot. at 14–15.) However, it is also plausible that the term "locations" refers to the reach of the promotional or advertising material—a national or international advertisement in contrast to a local or regional advertisement. This interpretation comports with the stated purpose of paragraph 8—"joint cooperation." Because this provision is also ambiguous HRCI's motion to dismiss this counterclaim for breach of contract is denied.

### 5. *Damages*

■■■■■ To state a claim for breach of contract under New York law, a plaintiff must allege damages. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). The Hard Rock Defendants allege that the purported breaches damaged their "goodwill, standing and reputation." (Countercl. ¶ 3.) These allegations are sufficient to survive a motion to dismiss. *See Smith McDonnell Stone & Co. v. Delicato Vineyards*, No. 94 Civ. 6474(JFK), 1995 WL 375918, at *4 (S.D.N.Y. June 22, 1995) (allegations that the breach " 'reduce[d] [counterclaim-plaintiff's] value,' improved 'the market position of a direct competitor,' and ... reduc[ed] [counter-claim plaintiffs] ability to engage in confidential exclusive acquisition negotiations with other parties' are sufficient allegations of damages to withstand a Rule 12(b)(6) motion").

### B. *Breach of the Covenant of Good Faith and Fair Dealing*

■■■■■ Every contract governed by New York law "implies a covenant of good faith and fair dealing 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Fellows v. CitiMortgage, Inc.*, 710 F.Supp.2d 385, 407 (S.D.N.Y.2010) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir.2006)). This covenant does not add obligations beyond those set forth in the agreement; rather, it protects a party to a contract from improper conduct that "subvert[s] the contract itself." *Butvin v. DoubleClick, Inc.*, No. 99 Civ. 4727(JFK), 2001 WL 228121, at *7 (S.D.N.Y. Mar. 7, 2001); *ARI and Co., Inc. v. Regent Int'l Corp.*, 273 F.Supp.2d 518, 523 (S.D.N.Y. 2003). New York law does not "recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts." *Fellows*, 710 F.Supp.2d at 407 (citing *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (1995)). However, where the existence or meaning of a contract is in doubt, a party may plead a claim for breach of the covenant of good faith and fair dealing in the alternative. *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 2667(LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (citing *E*Trade Fin. Corp. v. Deutsche Bank AG*, 2008 WL 2428225, at *26 (S.D.N.Y. Jun. 13, 2008)). Alternative pleading is permitted because "[a] party is only precluded from *recovering* on both theories at the same time." *Fantozzi*, 2008 WL 4866054, at *7 (emphasis added).

■■■■ The Hard Rock Defendants base their breach of duty counterclaim on the same factual predicate as their breach of contract counterclaims, and add the allegation that HRCI told the Hard Rock Defendants' business partners that the Hard Rock Defendants lacked the authority to sub-license the Hard Rock Marks. Because the Agreement provides that the

Hard Rock Defendants may sub-license the Hard Rock Marks (*see* Agreement ¶¶ 2(a), 10) this additional allegation suggests HRCI engaged in "conduct that subvert[ed] the contract's purpose without violating its express terms." *JPMorgan Chase Bank, N.A. v. The IDW Grp., LLC,* No. 08 Civ. 9116(PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009); *Verzani v. Costco Wholesale Corp.,* 641 F.Supp.2d 291, 300 (S.D.N.Y.2009). Any finding that these actions constitute a breach of the covenant of good faith and fair dealing simply recognizes that HRCI promised not to act in a way that prevented the Hard Rock Defendants from enjoying their rights under the Agreement. *See M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990). Finally, because this counterclaim is pled in the alternative, there is no possibility of double recovery. Accordingly, HRCI's motion to dismiss this counterclaim is denied.

### C. Tortious Interference with Business Relations

#### 1. Choice of Law

The parties agree that whether Nevada law or New York law applies to this claim the "outcome would be the same." *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 30 (2d Cir. 1999); (Pl. Mot. at 19); (*see* Def. Opp'n at 16). Thus, this Court need not "determine which state's law applies." *Commercial Union Ins. Co.,* 190 F.3d at 30.

#### 2. Identity of Specific Business Relationships

■ To allege a claim of tortious interference with business relations, a counterclaim-plaintiff must show "(1) it had a business relationship with a third party; (2) the [counterclaim-] defendant knew of that relationship and intentionally interfered with it; (3) the [counterclaim-] defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the [counterclaim-]defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 400 (2d Cir.2006) (quoting *Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003)).[3]

■ To survive a motion to dismiss, the Hard Rock Defendants must allege a specific relationship with which HRCI interfered. *Gianni Versace. S.p.A. v. Versace,* No. 01 Civ. 9645(PKL), 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003) ("A properly pleaded counterclaim for this tort must allege relationships with specific third parties ....") (collecting cases). The Hard Rock Defendants allege that HRCI interfered with their relationships with "hotel-casino owners and operators," "potential development partners or sublicensees," and "one or more lenders to the Hard Rock Defendants." (Countercl. ¶¶ 3, 26, 27; Def. Opp'n at 16.) These allegations fail to "specify some particular, existing business relationship" sufficient to state a claim. *Minn. Mining and Mfg. Co. v. Graham–Field, Inc.,* No. 96 Civ. 3839(MBM), 1997 WL 166497, at *7 (S.D.N.Y. Apr. 9, 1997) (claim of interference with "relationships with [counterclaim plaintiff's] customers" insufficient); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,* No. 03 Civ. 3120(LTS), 2005 WL 1902780, at *19 (S.D.N.Y. Aug. 9, 2005)

**3.** While Nevada law phrases the elements somewhat differently, the requirements are the same. *Leavitt v. Leisure Sports Incorporation,* 103 Nev. 81, 734 P.2d 1221, 1225 (1987) ("1) [A] prospective contractual relationship between the plaintiff and a third party; 2) the defendant's knowledge of this prospective relationship; 3) the intent to harm the plaintiff by preventing the relationship; 4) the absence of privilege or justification by the defendant; and, 5) actual harm to the plaintiff as a result of the defendant's conduct.") (citation omitted).

(dismissing allegations of interference between plaintiff and its "business partners, transaction targets and/or financiers"); *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893(GBD), 2004 WL 2903776, at *19–20 (S.D.N.Y. Dec. 14, 2004) (finding the terms "clients" or "customer accounts" .... "fail[s] to identify the third parties that plaintiffs had ... prospective business relationships with."); *see also Leadsinger, Inc. v. Cole,* No. 05 Civ. 5606(HBP), 2006 WL 2320544, at *13 (S.D.N.Y. Aug. 10, 2006) (denying motion to dismiss where plaintiff identified at least one specific business relationship); *Reading Int'l, Inc. v. Oaktree Capital Mgmt, LLC,* 317 F.Supp.2d 301, 335 (S.D.N.Y.2003) (same).

The Hard Rock Defendants reliance on *SLM, Inc. v. Shelbud Products Corp.*, 92 Civ. 3073(JFK), 1993 WL 127969, at *4–5 (S.D.N.Y. Apr. 20, 1993) and *Shred–It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F.Supp.2d 228, 239 (S.D.N.Y.2002) is misplaced. Both *SLM* and *Shred–It USA* rely on *Conley* pleading standards, which were overruled by *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 561–563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Accordingly, HRCI's motion to dismiss the counterclaim for tortious interference with business relations is granted.

### CONCLUSION

For the foregoing reasons, DLJMB HRH VoteCo LLC, DLJ MB IV HRH, LLC, and DLJ Merchant Banking Partners IV, L.P., Morgans Hotel, and Morgans Group's motion to dismiss HRCI's claims against them is granted. Defendant Morgans Management's motion to dismiss is denied. The Hard Rock Defendants' motion to compel arbitration of claims relating to the quality of Rehab and the Tulsa and Albuquerque Properties is granted. The Hard Rock Defendants' motion to stay this action pending the completion of arbitration is denied. The Hard Rock Defendants' motion to dismiss the claim of breach of the best efforts clause is denied.

HRCI's motion to dismiss the breach of contract counterclaim for seeking to develop properties in the Morton Territories, and the counterclaim for tortious interference with business relations is granted. HRCI's motion to dismiss the breach of contract counterclaims for registering hardrockcasinoalbuquerque.com, failing to include the Tulsa and Albuquerque Properties in pull down lists, and failing to mention the Tulsa and Albuquerque Properties in advertisements is denied. Finally, HRCI's motion to dismiss the counterclaim for breach of the covenant of good faith and fair dealing is denied.

The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 36 and 38.

SO ORDERED.